Filed 1/16/14  In re L.P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.P., a Person Coming Under the Juvenile Court Law. | B247552 (Los Angeles County Super. Ct. No. CK92612) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. K.F., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Anthony Trendacosta, Juvenile Court Referee.  Affirmed.

Boxer McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Minor.

* * * * * *

K.F. (Mother) appeals after the juvenile court terminated jurisdiction over her daughter, L.P., at a Welfare and Institutions Code[1] section 364 hearing. Mother challenges the juvenile court's exit orders granting sole legal and physical custody of the child to N.P. (Father) with monitored visits for Mother. We affirm.

**FACTS AND PROCEDURAL BACKGROUND**

On March 20, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a section 300 petition on behalf of two-year-old L.P. As amended, the sustained petition alleged that on February 17, 2012, Mother placed the child in a detrimental and endangering situation by leaving the two-year-old in the front yard of R.C.[2] (Paternal Grandmother) without adult supervision. On January 28, 2012, Mother drove a vehicle and failed to place the child in a child safety restraint seat, while the child was a passenger in Mother's vehicle. Mother's conduct placed the child at risk of physical harm.

The detention report stated that the child was removed from Mother's care on March 15, 2012 for severe neglect. The child was placed with Father, who was non-offending. On February 17, 2012, the social worker received an immediate response referral alleging severe neglect of the child by Mother. Law enforcement reported that they had received a call from a neighbor reporting they saw Mother leave a very young child unattended on the front porch of the residence of Paternal Grandmother. Mother then drove off in a gray Honda.

A Los Angeles Police Department officer stated that, when he responded to the residence of Paternal Grandmother, she reported she had just arrived home after receiving a telephone call from Father. Father asked her to rush home because Mother had left the child alone on the porch of Paternal Grandmother's house. Mother apparently put the child on the porch and then tied something around the fence to keep the child inside the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] The petition erroneously alleges the child was left in the front yard of the maternal grandmother, rather than, Paternal Grandmother's front yard.

2

yard.  Father was in Las Vegas on business.  Father said Mother called him and told him she dropped the child off with her bags at Paternal Grandmother's house.

The social worker went to Paternal Grandmother's home on February 17, 2012. Paternal Grandmother told the social worker that earlier that day she received a telephone call from Father and Mother.  Mother told Paternal Grandmother:  "Just give [the child] to her daddy.  I know you are home, you have nothing to do."  No one was at Paternal Grandmother's house when Mother left the child on the front porch.  Paternal Grandmother was at her sister's house.  When Paternal Grandmother rushed home, she found the child on the front lawn all by herself.  Mother had used a hair-tie to fasten the front gate because the child kept trying to open it.  The child was crying and looked scared when Paternal Grandmother arrived home.  The child had a bag with one pair of jeans, sweats and pampers.

According to Paternal Grandmother, Mother called Paternal Grandmother's daughter, A.B., the day before the incident and stated Mother needed to do something on February 17, 2012.  Mother said Paternal Grandmother needed to watch the child.  A.B. told Mother that neither A.B. nor Paternal Grandmother would be able to watch the child for Mother.  Paternal Grandmother indicated that the week before on Wednesday, February 8 or Thursday, February 9, 2012, Mother went to Paternal Grandmother's home unannounced.  Mother dropped off the child and stated she needed to go to court and could not take the child with her.  Mother did not pick up the child until Saturday night. Paternal Grandmother said Mother could be really nice to Paternal Grandmother one moment and then switch to being mean and cussing at people.  Mother called Paternal Grandmother over the past weekend and cursed at Paternal Grandmother regarding visiting the child.

Paternal Aunt stated Mother came unannounced to Paternal Grandmother's house on February 14, 2012 and dropped the child off saying she would be back.  Paternal Aunt called Mother to come and get the child after it got really late.

3

Maternal Grandmother, C.W., said Mother initially brought the child to her house on the date of the incident. However, when the child started crying, Mother became upset and said she was taking the child to Paternal Grandmother's house.

The child appeared happy in Paternal Grandmother's care. The child would come up to her and hug and kiss her. The child called her "mama." Paternal Grandmother stated that she had custody of the child from the time the child was three months old until she was one year old. At some point, Mother decided she wanted to give Father and Paternal Grandmother custody of the child through a notarized letter. Mother insisted on bringing the child to the police station to give them custody of the child but Mother changed her mind.

Father said that Mother texted him that she was dropping the child off at Paternal Grandmother's home. Father was in Las Vegas working when Mother left the child on the front porch and he was not able to get home in a timely manner. He wanted to gain custody of the child in a family law court. Father thought Mother was bipolar because she could be very nice one minute and very angry the next minute. Mother would call his house ranting and raving. He did not think Mother wanted to raise the child and thought Mother was always angry with him because they were no longer together.

On March 14, 2012, Father reported that he went to family law court but did not gain custody of the child. Father said there was confusion and he got "the runaround from the staff at court."

On March 15, 2012, the department received a telephone call from the Paternal Grandmother's house. Paternal relatives indicated Mother came to the home and told them that the social worker told her to go to the house and take the child. The statement was not true. A fight ensued and the social worker's supervisor called the police. When the social worker arrived at the house, Mother and Paternal Grandmother were yelling at each other. Mother said she went to the house to drop off some belongings. Mother reported she wanted to see the child; however, Paternal Grandmother said the child was with Father. Mother and Paternal Aunt got into a physical altercation. When police officers arrived, the social worker served Mother with the protective custody order.

4

The department also reported Mother had been a dependent of the court around 1993. Mother had four prior referrals concerning the child. Mother was currently engaged in a voluntary family maintenance case. The first referral was on December 16, 2009 when the child was five months old. An anonymous person reported seeing Mother slap the child on the leg and leaving the child crying for an extended period of time. The allegation was closed as unfounded.

The second referral was on December 7, 2011, when an allegation of general neglect of the child by Mother was made by a law enforcement officer. Mother was in custody after she was arrested for being a getaway driver during a residential burglary. The child was in the car with Mother. A safety plan was made and the child was to live with her grandmother. The December 2011 referral was closed as inconclusive after the voluntary family maintenance was initiated.

A third referral was made a little over a month later, on January 9, 2012, when a Department of Public Social Services employee reported Mother was in the office completing paperwork and the child began acting out. Mother cursed, pushed and pulled the child to get her under control. As Mother was leaving the building, she told the child: "[T]hese people don't give a fuck about you and what I'm going to do to you." As they walked out, Mother continued to roughly push and pull the child by her arm. The referral was substantiated and a voluntary family maintenance was initiated. After signing the contract, Mother said she did not intend to take counseling or complete a parenting class as required by the contract.

The fourth referral was made on January 30, 2012 after law enforcement reported Mother was driving a car with seven children, including the child not using a seat belt. The child was sitting in a car seat, which was not strapped into the car. Mother resisted arrest and was restrained. Mother was later released with a citation. The referral was closed as being inconclusive with the child remaining in an open case.

At the March 20, 2012 detention hearing, Father's counsel and Mother's counsel advised the juvenile court that the parents and Father's companion were involved in an altercation outside the courtroom. Father's counsel said Mother was making "negative

5

comments that were somewhat threatening." Mother's counsel said Father was not present during the incident but there was an exchange of words between Father's female companion and Mother, which was instigated by the companion. The court ordered that all contact between the parents occur through the department. The parties were also ordered not to make negative comments in the child's presence. Mother was ordered not to contact Father under any circumstances.

The court found Father to be the child's presumed father. The court ordered that the child be detained from Mother and be released to Father. Mother was given monitored visits with the child. Pursuant to Mother's request, the department was ordered not to interview her about the allegations in the petition. The court ordered that the results of the criminal proceedings against Mother be provided to the juvenile court with any recommendations for additional services.

In the April 2012 jurisdiction/disposition report, the department reported the child remained placed with Father, whose address was confidential. Paternal Grandmother had physical custody of the child from three months until she was one year old.[3] Paternal Grandmother said Father's friend called her to come get the child when the child was three months old because Mother was in the closet crying. Paternal Grandmother said she did not have problems with Mother in the past, however, she believed there was now something wrong with Mother. Mother would call Paternal Grandmother "talking 'mess'" and then act as if nothing was wrong. In January 2012, Mother began saying Father should take custody of the child. Recently, Paternal Grandmother observed some "odd" behavior in the child where the child pulled down her pants. The child also would hug her doll tightly and then kiss the doll's stomach and buttocks.

On March 28, 2012, when Mother called the social worker, she was irate and very upset and wanted to know why the department was looking for her. She also wanted to know why the department had other cell phone numbers for her. Mother said she did not

---

[3]     Father has three older children, all of whom live with their respective mothers. One of the children was the subject of a 2005 department investigation, however, Father was listed on the referral.

6

want the court to think she was hiding and provided a cell phone number, which the social worker said would be updated in the system. Mother then agreed to go to the department the next day to talk about counseling and visits, however, Mother failed to keep the appointment or call.

Father said he did not know too much about Mother or what she does other than dealing with the child. Father did not like dealing with Mother because she has a "bad temper." According to Father, Mother is "crazy," lies and blames others for what she did and she was trying to blame him for the current situation.

The department attached a copy of the police report from Mother's residential burglary arrest in December 2011. Redondo Beach Police officers took the child into custody after Mother was arrested. The department also attached a copy of Mother's January 2012 Inglewood Police Department arrest for child endangerment (Pen. Code, § 273a, subd. (b)). On April 4, 2012, Detective Garrett of the Inglewood Police Department said the case was forwarded to the City Attorney's Office, but he did not believe it would be filed because the department was working with Mother.

The department recommended that Mother be ordered to undergo a mental health evaluation and individual counseling and that Father be ordered to have parenting classes.

In a last minute information for the court, the department stated the social worker made contact with Mother on April 9, 2012. When asked why she was a no show for the March 29, 2012 appointment, Mother said she told the department "if" she could make it, she would come to the appointment.

On April 12, 2012, Mother, the social worker and a supervising social worker met outside Mother's apartment. Mother was irritated. She was given referrals for parenting classes and individual counseling. She indicated Father was not allowing her to have contact with the child. The social worker explained that Father was not allowed to act as monitor. A two-hour visit was scheduled for April 16, 2012. Mother was 35 minutes late for the visit. During the visit, Mother initially cried and was upset but calmed down towards the end of the visit. The child was at ease in Mother's presence and played with her. Mother was alarmed because the child was "apprehensive" when Mother changed

7

the child's clothes. Mother explained that she had previously been molested so the child's reaction concerned Mother. After the visit, Mother stated she was not enrolled in any parenting classes or counseling.

Paternal Grandmother indicated that since the incident with the child, strange people had been coming to her home and asking for people who did not live there. Paternal Grandmother felt Mother was the cause of this behavior. The social worker advised Paternal Grandmother to call the police if she felt unsafe. Paternal Grandmother also said Mother had been calling Father at his place of employment.

On April 19, 2012, Mother pled no contest to the amended petition. The juvenile court sustained the petition under section 300, subdivision (b). The matter was continued for Mother's contested disposition hearing.

On May 15, 2012, the department filed a last minute information for the court. Mother had a new social worker. The department reported Mother said she was enrolled in programs but did not have any contact information for the social worker.

The social worker met with Father and the child. Father said, the week before, Mother was chasing his vehicle down the street and he needed police assistance. Father did not have a police report concerning the incident. Neither Father nor the child was enrolled in any services. There was a concern about the child's display of sexualized behaviors. The social worker thought the child should be assessed by the Department of Mental Health. The department would follow up to see if Father took the child for medical appointments.

The disposition hearing was continued at the department's request. Mother's counsel asserted that the paternal relatives were not cooperating with her visitation. The court ordered that the department meet with Mother to set up a visitation schedule and to determine her compliance with services. Mother was given a minimum of three visits a week. Father's counsel was ordered to tell Father that the child was to attend all appointments and assessments.

On July 23, 2012, the department filed a last minute information for the court. The department reported that, on May 17, 2012, the social worker called Mother pursuant

8

to the court's May 15, 2012 order.  Mother was very argumentative and stated she did not need to meet with the department but consented to the meeting after it was explained to her that the court ordered the meeting.  During the meeting, she was angry and disputed the department's reports.  Mother claimed everything the paternal relatives said were lies.  It was reported that Mother seemed very knowledgeable about Father's "comings and goings."  When questioned about this, Mother explained that the paternal relatives told her about Father.  Mother was very upset with Father and said he was never a father before and that Paternal Grandmother cared for the child.  She felt Father was going to get what he wanted without complying with court orders.

Mother provided proof of intake for counseling and a substance abuse counseling letter.  She was advised that the department did not recognize the substance abuse agency because it was not licensed.  Mother noted she was not required to do substance abuse counseling but was doing it because she had used marijuana in the past.  Mother provided a letter from a child care center showing that the child attended school from July 13, 2011 to December 2011.  The letter explained that the interaction between Mother and the child was positive.

The social worker tried to keep Mother focused on what Mother needed to do, i.e., counseling, parenting, and visits.  Mother denied chasing Father in the car.  She also denied harassing Paternal Grandmother but said she did call her after finding her telephone number in a department report.  Mother was very cooperative during the meeting.

On May 29, 2012, Mother's monitored visit went well.  Mother was very appropriate and loving towards the child.  She brought clothes, snacks and toys for the child.

On July 3, 2012, Mother called the dependency investigator and complained that Father had missed the last two visits.  Mother stated that the social worker told her that she could not reach Mother to reschedule the last visit.  Mother said that Father was allowing her to have unmonitored visits with the child including an overnight visit.  She said Father tried to make it seem as if she was a bad Mother but then allowed the child to

9

stay with her overnight because he had something to do. Mother said she told her new social worker but nothing happened.

Both Father and Paternal Grandmother denied that the child was left with Mother for two days. Father failed to bring the child for a July 10, 2012 visit. Father's explanation was that he forgot the child had therapy scheduled for that day. On July 16, 2012, Mother indicated that she had missed three visits because Father failed to bring the child.

Mother said she was enrolled in classes at a junior college. Mother appeared to be addressing issues in therapy and making progress in parenting. A letter from Mother's individual counselor stated Mother acknowledged her mistake in leaving the child unattended. Mother had also "accepted the fact that she cannot force her daughter's father to be physically and emotionally present for daughter." The department recommended that she continue participating in individual counseling.

At the July 23, 2012 disposition hearing, the department changed its recommendation to unmonitored visits for Mother. The child's counsel agreed with the department's recommendation. Mother's counsel raised the issue of Father making the child available for visits. Father's counsel argued Mother was attempting to sabotage Father's portion of the case and that Father wanted sole physical and legal custody of the child.

The juvenile court declared the child to be dependent under section 300. The court found by clear and convincing evidence that a substantial danger existed to the child's physical health and emotional well-being if she was placed with Mother. The child was ordered to remain placed with Father. Mother was ordered to take a parenting class and participate in individual counseling to address case issues, including mental health. Mother was given unmonitored three-hour visits. The child was ordered to have play therapy. The matter was scheduled for a section 364 hearing with the hope that the case could be terminated.

In October 2012, the department reported the child was doing well in Father's home. The child was well cared for by Father and appeared to be well bonded with

10

Father. Paternal Grandmother cared for the child when Father was working. Mother was complying with the case plan and regularly visited the child. During monitored visits, the child was comfortable around Mother. Mother acted appropriately when the child had a tantrum.

Mother completed a parenting class and 12 individual counseling sessions. Mother was discharged after 12 counseling sessions because she met her treatment goals. The social worker thought she needed to continue to participate in counseling to address mental health issues. One of the issues included recent allegations in September and October 2012 that Mother had sexually abused the child. The allegations were under investigation, so Mother's visits had been changed to monitored.

Mother said she wanted to have overnight visits with the child and to eventually have the child returned to her care. Father said he did not have a problem with Mother having custody of the child. He said Mother was a good parent but he was concerned about the way she behaved when she was upset.

The department recommended that the case stay open for an additional three months to complete the pending sexual abuse investigation. The juvenile court continued the section 364 hearing for a contested hearing.

Delivered service logs from July 23, 2012 through December 4, 2012 indicated that, as of August and September 2012, Mother's demeanor and attitude had improved. However, after the sexual abuse allegations were made, Mother was very upset. She stated that Father's family was out to get her. Father was concerned about the referral and how it would affect the child. The child had been getting more anxious and would easily get emotional. The child had been biting her nails. Father denied that the child was sexually abused and he did not believe Mother was sexually abusing the child.

When the social worker interviewed the child on October 18, 2012, the child stated Mother touched her vaginal area. The child showed the social worker by lying on the floor and spreading open her legs. The child said Mother placed lotion on the child's legs and then the child pointed to her vagina and spread her legs wide open. The child

11

stated Mother was not bathing or cleaning her when she opened her legs. The child said she was not afraid of Mother.

On November 1, 2012, the social worker inquired why Mother had not visited the child. Mother responded that she would rather stay away until the December 2012 hearing because she did not want to be accused of doing anything else to the child. Mother said it made no difference that the visit would be monitored because "someone is out to get her in trouble."

On November 13, 2012, Mother was advised that the child's medical examination was negative and Mother's visits might be liberalized to unmonitored. Father stated Mother had not called or spoken to the child since sometime in October 2012.

On December 3, 2012, the child's therapist indicated she planned to end the sessions as the child met her goals. The therapist pointed out that the child seemed less anxious since Mother stopped visiting. The therapist thought Father was doing a good job with the child. He recommended that, if Mother and the child were reunified, they should have conjoint therapy.

In a December 2012 interim review report, the department stated Mother partially complied with the case plan by completing a parenting program. She completed 12 individual counseling sessions after she met treatment goals. Mother had not visited with the child or spoken to her over the telephone since the sexual abuse allegations were made against her.

The child continued to thrive in Father's care. The child's therapist recommended the child remain in Father's care. The department recommended the juvenile court terminate jurisdiction with a family law order granting Father sole physical and legal custody.

On December 17, 2012, the juvenile court granted Mother's request for conjoint therapy if the child's therapist deemed it appropriate. The court continued the matter noting that the pending investigation might affect Mother's visitation.

In a February 2013 interim review report, the department stated the social worker attempted to contact Mother after the December 17, 2012 hearing. Mother did not return

12

the call until December 31, 2012 when she stated she was ready to resume visiting the child. Father did not return the social worker's call about visiting until January 8, 2013. Mother wanted Friday visits because she had community service on Monday through Thursday. Father said it would be difficult for him because of his job; however, he agreed to a Friday visit but failed to show. Father refused the social worker's offer to transport the child because he said she did not do well with strangers.

Mother was upset and said she was willing to visit on Monday, January 28, 2012. Father brought the child to the visit, which went well. Mother, however, continually asked the child many questions and on three occasions asked the child if she needed to use the restroom. Mother also asked the child where she lived. When the child responded with Father, Mother shrugged her shoulder and said "yeah right" as if she did not believe her. Mother asked the child if someone was touching her "down there" and the child said "no."

Mother said her schedule for community service made it difficult to do conjoint therapy. The child's therapist stated that she could not provide conjoint therapy and could not refer them to anyone in her agency due to a long waiting list. Mother also could not participate because of her schedule. The therapist gave the social worker a referral to a different agency which indicated on February 13, 2013 that their services were specific and did not include conjoint therapy for adults. The child's therapy ended on November 28, 2012. Conjoint counseling services were recommended if Mother were to reunify with the child.

Visits were scheduled for February 4 and 11, 2013 but Father was a no show. Father said his cell phone fell into the water on February 4, 2013 and he had just replaced it. He did not call the social worker because he did not have her number.

The forensic medical report from December 11, 2012 stated the child could not be interviewed because she was not cooperative. The examination did not reveal any sexual or physical abuse or neglect. The sexual abuse allegations were determined to be inconclusive, however, the report advised against unmonitored visits with Mother at the time.

13

On January 28, 2013, during a monitored visit, the child repeatedly asked Mother if she could go home with her. Mother redirected the child to ask the social worker. The child continued to state, "Mom I wanna go home with you." Mother responded: "She will always want to live with me. She [has] always been with me [and] she needs to come home to me and you heard her say it too."

Father stated: "I need to make sure my child is safe and honestly I don't trust [Mother]. She is not stable. One day she seems normal another day she just goes off. I'd prefer for the case to close and [the child] stay with me, [Mother] can have monitored visits if at all. I just don't want nothing [*sic*] to happen to her that's all."

The department noted the consistent care Father gave to child and the lack of reported incidents of child abuse. Mother was in partial compliance and chose to stop visiting the child once the sexual abuse allegations were made. Mother's participation in counseling and parenting programs did not seem to have given her enough tools to cope with ongoing issues. Mother was often observed to be anxious so the social worker offered to hold a child and family team meeting to assist Mother. However, Mother declined the offer. The hostility between the parents remained the same since the case started. The department stated the family law court would be the best forum to resolve any remaining issues. The department recommended termination of jurisdiction with a custody order granting Father sole physical and legal custody of the child.

Mother testified at the contested section 364 hearing. Mother completed a parenting program where she learned "safety first" and how to protect her daughter. In individual counseling, Mother learned to work on her attitude and how to address situations. She also learned how to keep the child safe at all times. She now understood that it was dangerous to leave the two-year-old child unattended in a yard. She thought it was not in the best interest of Mother or the child to have visits after the sexual abuse allegations were made. She said that, when she had monitored visits, something negative was always written about her in the reports. She said that the social worker did not do what Mother asked. Mother testified she has "difficulties." She did not think the child

14

should have to be subjected to medical examination. She testified: "I mean that's kind of embarrassing."

Mother testified that she requested visits on December 27, 2012 by leaving voicemails, which the social worker did not get. She made contact with the social worker on December 31, 2012. She had only one visit since the last court date and did not cancel any visits. Father canceled two visits and could not make another visit because of a court date. Mother was willing to visit on a different date other than Friday and she was also willing to participate in conjoint therapy but there was no follow-up. Mother wanted the child returned to her.

Counsel for the department, Father and the child submitted on the recommendation to terminate jurisdiction with the family law order granting sole legal and physical custody to Father. Mother's counsel requested that the child be returned to Mother's custody. In the alternative, Mother requested joint custody and unmonitored visits if the case was terminated.

The juvenile court made the following statements. "The court would note from the history of this case that the incident in which the child was left with the grandmother or in her front yard was the fourth referral on the mother regarding abuse and neglect, not the first. There were other, quite honestly, more serious issues, in the court's view, that have not been addressed at all. And I don't believe that, even if one could argue that she's in compliance with the case plan, she's made substantive progress in that treatment. [¶] And I appreciate that a three-year-old wants to be with her mother. I would submit that most abused and neglected children want to be with the only parent that they know. But that's why adults make the decision and not three-year-olds." The court then terminated jurisdiction and granted sole legal and physical custody to Father. Mother's timely appeal followed.

## DISCUSSION

In this case, the juvenile court terminated jurisdiction by granting Father sole legal and physical custody. It should be noted that, although the court detained the child as to Mother, the child was never taken from Father's custody. The child had spent most of

15

her life living with Father and Paternal Grandmother. The child was happy and well-cared for living with Father. There was no concern about the child living with Father because she was thriving in his care. Thus, there was no need for the court to continue jurisdiction over the child because she was living with her non-offending father. In addition, there was no longer any need for court supervision because the child was not being subjected to the conditions which warranted jurisdiction, i.e., Mother's neglect. As a result, the juvenile court was required to dismiss the petition. (§ 364, subd. (c); *In re Joshua G.* (2005) 129 Cal.App.4th 189, 203; *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 714.)

Mother does not challenge the termination order. Rather, she claims that the custody and visitation orders must be reversed under an abuse of discretion standard. According to Mother, the record showed she: successfully completed her case plan; had consistent and positive visits with the child; and had a strong bond with the child as shown by their visits. Mother further asserted Father threatened the bond by failing to take the child to court ordered visits.

Mother's claims concerning custody and visitation orders do not require reversal. When the juvenile court terminates jurisdiction, it has authority to issue exit orders determining the visitation of a noncustodial parent after a child has been declared a dependent of the court. (§§ 362.4; 364, subd. (c); *In re Chantal S.* (1996) 13 Cal.4th 196, 203–204.) Such custody and visitation orders are transferred to the family law matter and "'remain in effect until modified or terminated by the superior court.'" (*In re Chantal S.*, *supra*, at p. 203; *In re Roger S.* (1992) 4 Cal.App.4th 25, 30.) In making the visitation order, the juvenile court must look to the best interests of the child. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50–51; *In re John W.* (1996) 41 Cal.App.4th 961, 973–974.) "While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.'" (*In re Julie M.*, *supra*, at p. 50, quoting *In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376.) A visitation order determining the best interests of a dependent

16

child may be reversed only upon a clear showing of abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067; *In re Shawna M.* (1993) 19 Cal.App.4th 1686, 1690.)

The juvenile court acted within its discretion to grant sole physical and legal custody to Father based on Mother's prior neglect of the child. The department filed the petition to protect the child after Mother had left the two-year-old child unattended on the front porch of paternal relatives. Mother drove off in a vehicle claiming she believed paternal relatives were in the home hiding from her because they did not want to keep the child. The day before this incident paternal relatives told her that no one would be home to watch the child. After Mother left the child unattended in the front yard, Paternal Grandmother had to rush home after she received a call from Father who was working in Las Vegas. When Paternal Grandmother arrived home, the child was alone, crying and frightened.

Moreover, by the time of the incident, Mother had four prior referrals related to the child. One referral occurred when the child was five months old, when it was reported Mother had slapped the child. The second referral involved Mother taking the child with her when she was suspected of driving a getaway car in a residential burglary. The child was taken into custody after Mother was arrested for the residential burglary. On a third occasion, a referral was made while Mother was in a public assistance office and the child began having a tantrum. Mother pulled, pushed and cursed at the two-year-old child. The fourth referral was made after Mother was pulled over by police officers for driving seven children around in a car without restraints for all of them. The child was in a car seat which was not attached to the vehicle. Police cited Mother for child endangerment. Mother was taken into custody after she resisted arrest concerning this incident.

Furthermore, Mother's visitation throughout the dependency proceeding was not as consistent as she claims. Mother chose not to visit her child during the early proceedings; and she chose not to visit the child when sexual abuse allegations were raised. In addition, Mother was described by several parties as having mood swings.

17

Mother was volatile around the child and adults. She had demonstrated a lack of any judgment in leaving a two-year-old child unattended on a front porch, taking the same child on a residential burglary and driving seven children around in a vehicle without proper restraints. Given this history, the juvenile court did not abuse its discretion by limiting Mother's access to the child even though she had completed a parenting class and 12 counseling sessions.

Finally, we disagree with Mother that Father's failure to cooperate in making the child available for visits requires a different result. Father's lack of cooperation does not provide a basis for granting Mother physical or legal custody or unmonitored visitation given Mother's history. Rather, Mother is free to pursue any lingering custody or visitation issues in the family law court. (*In re Joshua G., supra*, 129 Cal.App.4th at p. 203; *In re Jennifer R., supra*, 14 Cal.App.4th at p. 714.)

**DISPOSITION**

The orders are affirmed in their entirety.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J. *

                       FERNS

We concur:


_____, Acting P. J.

    ASHMANN-GERST


_____, J.

    CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.